# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| WENDY KNIGHT,<br><br>                Plaintiff,<br><br>v.<br><br>O'REILLY AUTO ENTERPRISES,<br>LLC, d/b/a O'REILLY AUTO PARTS,<br><br>                Defendant. | )<br>)<br>)<br>)<br>)   Docket No. 2:17-cv-300-NT<br>)<br>)<br>)<br>)<br>)<br>) |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS

Before me is Defendant O'Reilly Auto Enterprises' ("**O'Reilly's**") motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 and for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Def.'s Mot. (ECF No. 31). For the reasons set out below, the Defendant's motion is **GRANTED** in part and **DENIED** in part.

## BACKGROUND[1]

O'Reilly is in the business of selling auto parts to commercial installers, such as automobile repair shops. Consolidated Statement of Material Facts ("**CSMF**") ¶ 5 (ECF No. 59). Nicholas Thomas is a Regional Manager at O'Reilly for the region that includes Maine. CSMF ¶ 1. Jesse Hebert, who reports to Thomas, is a District

---

[1] This background is drawn from undisputed facts from the parties' consolidated statement of material facts. I also take the Plaintiff's version of disputed facts provided that they have record support and are otherwise admissible. The parties each make multiple requests to strike based on evidentiary objections. To the extent that I use a fact to which either party has made an objection, the objection is overruled.

Manager responsible for ten stores in Southern Maine. CSMF ¶ 3. In about 2016, Don Liedke assumed the position of Store Manager at O'Reilly's Portland store. CSMF ¶ 63.

Plaintiff Wendy Knight was hired to work as a delivery specialist at O'Reilly's Portland store in May of 2014. CSMF ¶ 14. Knight's job responsibilities included driving a truck to make deliveries to O'Reilly customers and stocking store shelves when there were no deliveries to be made. CSMF ¶¶ 6, 20. For over two years, Knight worked weekdays from 9:00 am to 2:00 pm during the school year, which allowed her to care for her two children who have disabilities. CSMF ¶¶ 16-18. Knight also worked eight hour shifts on some holidays, weekends, and during the summer. CSMF ¶ 16. Knight met performance expectations at all times during her employment with O'Reilly. CSMF ¶ 101.

At some point before May of 2016, Knight started complaining to Liedke that the women at O'Reilly's Portland store were expected to work harder then the men. The essence of her complaint was that the women who worked as delivery specialists were required to shelve parts while their colleagues who were men were allowed to remain idle waiting for their next delivery assignment. CSMF ¶¶ 64-66. On April 29, 2016, Knight called an O'Reilly corporate hotline for employees to express her complaint that she was discriminated against at work because she was a woman. CSMF ¶¶ 68-69. As a result of that call, District Manager Hebert met with Knight to discuss her concerns. CSMF ¶ 70. Knight reiterated her concerns to Hebert, and in a follow-up statement Knight wrote:

I am not asked to do tasks at work. I am told to do them. When there are 4-5 other capable drivers standing around and watching me work and then Don comes around and tells me to get this done it is disrespectful and unfair. I have seen this happen with other female employees as well. Whether it's Don's intention or not to discriminate this is how it feels and appears.

CSMF ¶ 72.

At some point in April, Knight called the Occupational Safety and Health Administration ("**OSHA**") to complain about merchandise being left in hallways, creating dangerous conditions at the store for workers. CSMF ¶ 79. On May 3, 2016, Knight tripped over a rolled-up mat obscured by merchandise and injured her wrist. CSMF ¶ 83. On May 4, 2016, Knight reported this injury to OSHA. CSMF ¶ 84. OSHA contacted Liedke about Knight's complaint, although it is unclear whether OSHA ever identified Knight as the complainant. CSMF ¶ 85; *see* Knight Supp. Ex. 2 at 1 (ECF No. 35-2).

Approximately a week or two after Knight's injury and report, Liedke published a weekly schedule with Knight scheduled to work only 15 hours. CSMF ¶ 108; Knight Dep. 57-58 (ECF No. 30-5). Knight confronted Liedke about the change. Knight Dep. 58. Liedke, without explaining why the change had been made, returned Knight to her normal hours. Knight Dep. 58. Around this time, Knight observed a change in Liedke's demeanor toward her: "His attitude was very different. He was more angry when I came to him and short-tempered, spoke very quick, short." CSMF ¶ 110.

Nicholas Thomas, who assumed the position of Regional Manager in 2015 after having worked for O'Reilly for six years, began to focus on ways to improve efficiency,

profitability, and productivity. CSMF ¶¶ 21-23. In mid-2015, Thomas began telling his regional managers that delivery specialists should work full-day shifts in order to maximize productivity and profitability. CSMF ¶¶ 26, 28. Thomas thought it made sense to hire full-shift drivers. ¶ 33. Thomas began to put more focus on this idea in 2016, but some stores continued to allow delivery specialists to regularly work shifts shorter than eight hours. CSMF ¶¶ 44-45, 106. To date, Thomas continues to express his preference that stores move in the direction of only employing delivery specialists who can work full-shifts, but he has not held district managers accountable for not complying with his preference. CSMF ¶ 39. Thomas further stated that there are no grounds to terminate an employee for not working eight-hour shifts. CSMF ¶ 54.

In mid-August of 2016, Thomas and Hebert conducted a mid-year review with Liedke. CSMF ¶ 86. A day or two later, on August 19, 2016, Liedke met with Knight and informed her that Thomas had made the decision that she would need to start working eight-hour shifts per "company policy." CSMF ¶¶ 92, 111. Knight called O'Reilly's human resources department after the meeting to determine if there was such a policy. CSMF ¶ 94. Human resources personnel did not know if there was a policy but informed Knight that Thomas would contact her. CSMF ¶ 94. Thomas did not contact Knight, but he instructed Hebert to follow up with her. CSMF ¶ 95. On August 23, 2016, Hebert met with Knight to discuss her work schedule. CSMF ¶¶ 96, 116. Knight told Hebert that she could not work eight-hour shifts because she had to care for her children. CSMF ¶¶ 97, 116. Knight claims that Hebert grew agitated during the meeting and told her repeatedly that if she could not work eight-hour

shifts then he had no hours for her. CSMF ¶¶ 116-119. Hebert told Knight that he and Liedke had been "trying to get rid of [her] for months." CSMF ¶ 117.

Although the record does not make clear whether this was Knight's last day, the parties do not dispute that she left O'Reilly after this conversation. The Defendant concedes, for purposes of summary judgment, that the Plaintiff suffered an adverse employment action. *See* Def.'s Mot. 9-10.

On August 9, 2017, the Plaintiff filed a Complaint asserting three counts: sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("**Title VII**"), 42 U.S.C. § 2000e *et seq*., and the Maine Human Rights Act ("**MHRA**"), 5 M.R.S. § 4451 *et. seq.*; associational disability discrimination in violation of the Americans with Disabilities Act ("**ADA**"), 42 U.S.C. § 12112 *et seq.*, and the MHRA; and retaliation for engaging in protected conduct under Title VII, the ADA, the MHRA, and the Maine Whistleblower's Protection Act ("**MWPA**"), 26 M.R.S. § 831 *et seq*. The Defendant moved for summary judgment or judgment on the pleadings on all counts.

## LEGAL STANDARD

"A motion for judgment on the pleadings is treated like a Rule 12(b)(6) motion to dismiss." *Portugues–Santana v. Rekomdiv Int'l Inc.*, 725 F.3d 17, 25 (1st Cir. 2013). Under a Rule 12(b)(6) motion to dismiss a claim the pleading "'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Gianfrancesco v. Town of Wrentham*, 712 F.3d 634, 638-39 (1st Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is genuine where a reasonable jury could resolve the point in favor of either party. *Oahn Nguyen Chung v. StudentCity.com, Inc.*, 854 F.3d 97, 101 (1st Cir. 2017). A fact is material where it could influence the outcome of the litigation. *Id.* On a motion for summary judgment, courts must construe the record in the light most favorable to the non-movant and resolve all reasonable inferences in the non-movant's favor. *Burns v. Johnson*, 829 F.3d 1, 8 (1st Cir. 2016).

## DISCUSSION

The Defendant argues that judgment should enter in its favor because (i) the Plaintiff cannot establish a prima facie case of disparate treatment on account of her sex and the Plaintiff cannot show that O'Reilly's legitimate, neutral business reason was a pretext for unlawful sex discrimination; (ii) the Plaintiff does not state a claim for associational disability discrimination because she fails to allege unlawful bias on the part of any of the decisionmakers; and (iii) the Plaintiff cannot show that any decisionmakers acted with retaliatory animus. I address each count in turn.

## I.     Sex Discrimination

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).[2] The Plaintiff alleges that she was discriminated

---

[2]     I analyze the Plaintiff's sex discrimination claims together, because Maine courts look to Title VII caselaw when considering MHRA claims. *Cole v. Maine Office of Info. Tech.*, No. 1:17-CV-00071-

6

against because of her sex, plus her status as a caretaker. Compl. ¶ 28. The First Circuit has recognized that "the assumption that a woman will perform her job less well due to her presumed family obligations is a form of sex-stereotyping and that adverse job actions on that basis constitute sex discrimination." *Chadwick v. Wellpoint, Inc.,* 561 F.3d 38, 44 (1st Cir. 2009). "[S]ex-plus claims are a flavor of gender discrimination claims where an employer classifies employees on the basis of sex *plus* another characteristic." *Franchina v. City of Providence*, 881 F.3d 32, 52 (1st Cir. 2018) (quotation marks omitted). "[A]t the advent of sex-plus claims, courts recognized that '[t]he effect of [Title VII] is not to be diluted because discrimination adversely affects only a portion of the protected class.' " *Id.* at 53 (quoting *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194, 1198 (7th Cir. 1971)). "The inquiry in a Title VII disparate treatment case is whether the defendant intentionally discriminated against the plaintiff on the basis of a protected attribute." *Cumpiano v. Banco Santander P.R.,* 902 F.2d 148, 153 (1st Cir. 1990). A plaintiff may rely on either direct evidence of unlawful animus, or she may establish discriminatory intent through the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Cumpiano,* 902 F.2d at 153.

At the first step of the *McDonnell Douglas* framework, the Plaintiff must "establish, by a preponderance of the evidence, a prima facie case of discrimination." *Caraballo-Caraballo v. Corr. Admin.*, 892 F.3d 53, 57 (1st Cir. 2018). To establish a

JAW, 2018 WL 4608478, at *27 (D. Me. Sept. 25, 2018) (citing *Morrison v. Carleton Woolen Mills, Inc.*, 108 F.3d 429, 436 n.3 (1st Cir. 1997)).

prima facie case: "(1) the plaintiff must be a member of a protected class; (2) she must be qualified for her job; (3) she must suffer an adverse employment action at the hands of her employer; and (4) there must be some evidence of a causal connection between her membership in a protected class and the adverse employment action, e.g., in the case of a firing, that the position was filled by someone with similar qualifications." *Bhatti v. Trustees of Bos. Univ.*, 659 F.3d 64, 70 (1st Cir. 2011). At step two of the *McDonnell Douglas* framework, the Defendant must articulate a legitimate, nondiscriminatory reason for firing the Plaintiff. *Caraballo–Caraballo*, 892 F.3d at 62. At step three, the burden shifts back to the Plaintiff to show by a preponderance of the evidence that the Defendant's stated business reason was pretext for unlawful discrimination. *Johnson v. Univ. of P. R.*, 714 F.3d 48, 54 (1st Cir. 2013).

The parties have narrowed the issues. The Defendant concedes for purposes of summary judgment that the Plaintiff has made an adequate showing on the first three elements of her prima facie case. *See* Def.'s Mot. 9-10, & n.3. The Plaintiff concedes, also for purposes of summary judgment, that the Defendant has articulated a legitimate, nondiscriminatory reason for its action by identifying the efficiency gains from having full-time delivery specialists in the Portland store. *See* Pl.'s Opp'n 16-17 (ECF No. 40). The remaining issues are whether the Plaintiff has established a causal connection between her membership in a protected class and the adverse employment action sufficient to make out a prima facie case and whether the Plaintiff

has developed enough evidence to show that the Defendant's stated reason for the adverse action was a pretext for sex-based discrimination.

The Plaintiff's burden to establish the causation element of her prima facie case is not a difficult one. *Caraballo–Caraballo*, 892 F.3d at 57. The fourth element may be satisfied by showing that "the employer had a continued need for someone to perform the same work after [the Plaintiff] left." *Cumpiano*, 902 F.2d at 155. Here, Hebert essentially told the Plaintiff that if she was unable to work full-day shifts, she would lose her shifts to an employee who could work eight hours. CSMF ¶ 98. This continued need for a delivery specialist is enough for a prima facie showing of causation. *See Cumpiano*, 902 F.2d at 155 (plaintiff could satisfy the "fourth prong" of her prima facie case simply by showing that a replacement was sought).

I turn then to the third stage of the *McDonnell Douglas* framework where the Plaintiff must establish by a preponderance of the evidence that the Defendant's real reason for its adverse action was unlawful sex-based animus. The Plaintiff can establish pretext by showing "inconsistencies . . . in the employer's proffered legitimate reasons such that a factfinder could infer that the employer did not act for the asserted non-discriminatory reasons." *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000) (quotation marks omitted). The Defendant asserts that the adverse action resulted from the Plaintiff's inability to work full-time shifts in contravention of company policy. Viewing the evidence in the light most favorable to the Plaintiff, however, a reasonable factfinder could conclude that the "full-time" rule was not a "company policy"—at least not one that would

support the termination of an employee who was otherwise meeting expectations. The human resources personnel were unaware of any such company policy, and nobody was able to provide Knight with a written version of the policy. Thomas himself stated that an inability to work full-time shifts would not alone be a basis to terminate an employee. He also indicated that managers were not held accountable if they retained employees who worked less than full-time shifts, and many managers continued to retain part-time delivery specialists.

In addition to inconsistencies in the proffered legitimate reason, the Plaintiff offers comparator evidence. " 'Reasonableness is the touchstone' when considering comparators in a disparate treatment case; that is, 'while the plaintiff's case and the comparison cases that [s]he advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances.' " *Ray v. Ropes & Gray LLP*, 799 F.3d 99, 114 (1st Cir. 2015) (quoting *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir. 1999)).

The Plaintiff claims that 120 different employees were permitted to work a total of 9,517 shifts of less than eight hours between August 17, 2016 and November 17, 2017. Pl.'s Opp'n 18. In support of that claim, the Plaintiff provides hundreds of pages of schedules, but she does not tease out the information necessary to determine whether those other workers are fair comparators.[3] Nor does the Plaintiff show that the employees who were allowed to work shorter shifts were men or women without

---

[3]     For instance, someone who works an occasional seven-hour shift to attend to a medical appointment is not a fair comparator to the Plaintiff.

children. The Plaintiff also incorrectly places the burden to show comparators on the Defendant. *See* Pl.'s Opp'n 19. It is neither the Defendant nor the Court's burden to parse the data looking for comparator evidence. For the purposes of this motion, the Plaintiff has failed to present such evidence in her briefing.

The Defendant, however, concedes that there are "some delivery specialists in O'Reilly's Maine stores, other than the Portland store, [who] continue to work shifts shorter than eight hours, and in that respect have been 'treated more favorably' than Wendy Knight." *See* Def.'s Mot. 10. And the Defendant has produced evidence from which it is readily determined that at least three of those other delivery specialists were men. *See* Ex. H (ECF No. 30-8) (one man at the Arundel store); Ex. I (ECF No. 30-9) (two men at the Windham store). The Defendant argues, however, that these comparators were not similarly situated to the Plaintiff because the Portland store was bigger, busier, and had different business needs than the other Maine stores. Def.'s Mot at 10-11. In my view, the Defendant has "inappropriately circumscribed the universe of [delivery specialists] from which comparison cases could be drawn." *See Ray*, 799 F.3d at 114. The comparators in the Windham and Arundel stores have the exact same job as the Plaintiff. Although the Defendant makes much of the different business needs of the stores, I am unconvinced, [4] because every store presumably has the goal of optimizing the use of its delivery fleet.

---

[4] The Defendant attempts to contrast the busy Portland store from the Arundel store on the grounds that the "drivers at the Arundel store inevitably have idle time, which the manager fills by assigning non-driving tasks." *See, e.g.,* CSMF ¶ 59. But the Defendant concedes that delivery specialists in the Portland store were not "on the road" for their entire shifts. CSMF ¶ 99. The Defendant also acknowledges that when Knight was not busy making deliveries, she was expected to stock shelves. CSMF ¶ 20.

Finally, there is the evidence that when Hebert insisted on full-time shifts from the Plaintiff in their August 2016 meeting, he told her that he and Liedke had been "trying to get rid of [her] for months." CSMF ¶ 117.[5] Although Hebert did not connect this statement to the Plaintiff's complaints of sex discrimination, the statement is relevant to whether the full-shift requirement was legitimate or pretextual.

When the issue is "whether the employer's stated nondiscriminatory reason is a pretext for discrimination, courts must be particularly cautious about granting the employer's motion for summary judgment." *Billings v. Town of Grafton*, 515 F.3d 39, 56 (1st Cir. 2008) (quotation marks omitted). Given the fact that, at most, many managers viewed the eight-hour shift rule as a hiring preference rather than a company policy requiring termination of an employee who otherwise met expectations, given that there were male delivery specialists at the Arundel and Windham stores who continued to work shorter shifts,[6] given that Liedke treated women and men differently in assigning non-driving tasks, and given Hebert's statement to the Plaintiff in their final meeting, the record contains sufficient evidence of pretext and unlawful animus to clear the third step of the *McDonnell Douglas* framework. Accordingly, summary judgment is denied on Count One.

---

[5] The Defendant denies this fact, but he does not support the denial with any record citation as required by Local Rule 56(c). Even if the denial had been properly supported, it would have only created a disputed fact, and I am bound to view the facts in the light most favorable to the Plaintiff.

[6] The Defendant points to the departure of the one other delivery specialist at the Portland store who worked less than full-shifts shortly after the Plaintiff left as evidence that the policy was not applied as pretext. The Defendant has presented very little evidence about the circumstances around the employee's departure and I am not able to conclude that this employee's departure undercuts the Plaintiff's evidence of pretext.

## II. Disability Discrimination

In Count II, the Plaintiff claims that the Defendant unlawfully discriminated against her in violation of the ADA because of her association with her children with disabilities.[7] The ADA contains an associational discrimination provision, which makes it unlawful to "deny[] equal jobs or benefits to [an employee] because of the known disability of an individual with whom the [employee] is known to have a relationship or association." 42 U.S.C. § 12112(b)(4).

The ADA's associational discrimination provision is "intended to protect qualified individuals from adverse job actions based on unfounded stereotypes and assumptions arising from the employees' relationships with particular disabled persons." *Oliveras–Sifre v. P.R. Dep't of Health*, 214 F.3d 23, 26 (1st Cir. 2000) (quotation marks omitted).

> The EEOC also has concluded that this was the intended scope of the provision, as indicated through the three examples of forbidden association discrimination set out in its Interpretive Guidance on this provision of the ADA: "(1) refusal to hire where the employer makes an unfounded assumption that the employee will miss work in order to care for a disabled relative; (2) discharging an employee who does volunteer work with AIDS victims, due to fear that the employee may contract the disease; and (3) denying health benefits to a disabled dependent of an employee but not to other dependents, even where the provision of benefits to the disabled dependent would result in increased health insurance costs for the employer."

---

[7] As reflected in its motion, the Defendant originally thought that the Plaintiff advanced a failure to accommodate theory of ADA discrimination. The Defendant used its Reply to argue that the Complaint also failed to state a plausible disparate treatment claim for associational disability. The Plaintiff asks me to find that the Defendant has waived its challenge to the ADA disparate treatment theory. After reviewing the pleadings and the transcript of the parties' Local Rule 56(h) conference, I exercise my discretion to consider the Defendant's argument. *See Echevarría v. AstraZeneca Pharm. LP*, 856 F.3d 119, 133 n.18 (1st Cir. 2017). The Plaintiff has been allowed to file a sur-reply to address the Defendant's arguments, and I have considered that brief as well. (ECF Nos. 57, 59.)

*Id.* (quoting *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1081-85 (10th Cir. 1997)).

An employer is not required to provide a non-disabled employee with a reasonable accommodation under the ADA's associational discrimination provision. *Den Hartog*, 129 F.3d at 1084 (citing legislative history and EEOC interpretive guidance). The Plaintiff does not argue otherwise. Pl.'s Opp'n. at 4.

The elements of associational disability discrimination are similar to other types of discrimination. An employee must show that:

> (1) [s]he was qualified for the job at the time of the adverse employment action; (2) that [s]he was subjected to adverse employment action; (3) that h[er] employer knew, at the time of the adverse employment action, that [s]he had a relative or associate with a disability; and (4) that the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision.

*Leavitt v. SW & B Const. Co., LLC*, 766 F. Supp. 2d 263, 280 (D. Me. 2011).

The Defendant argues that it is entitled to judgment on the pleadings because

> [t]here is no allegation that Nick Thomas, Jesse Hebert or anyone else at O'Reilly was *motivated* to take adverse action against Knight because of her children's disabilities – for example, that the company thought it would be better off without parents of disabled children, on the theory that those parents are less attentive to their jobs than others, or that the children's disabilities would cost O'Reilly money.

Def.'s Reply 3 (ECF No. 53).[8] The Plaintiff responds that she has both stated a claim (as required under Rule 12) and made out a prima facie case of associational

---

[8]     The Defendant also argues that the Plaintiff failed to exhaust the disparate treatment claim. Def.'s Reply 3-4 (ECF No. 53). I find that the Plaintiff exhausted her disparate treatment claim, because she wrote in her administrative charge that she "was subject to unlawful disability discrimination based on [her] association with [her] children with disabilities." Charge of Discrimination 2 (ECF No. 42-1). While the charge could have used the phrase "disparate treatment," the charge captures the essence of her current claim. At the least, her claim has sufficient relation to her administrative charge to constitute "collateral and alternative bases or acts that would have been

discrimination (as required under Rule 56). Because the Defendant seems to be raising only a request for judgment on the pleadings on Count II, I consider only that argument.

In employment discrimination cases, "plaintiffs need not plead facts in the complaint that establish a prima facie case . . . nor must they 'allege every fact necessary to win at trial.' " *Garayalde–Rijos v. Municipality of Carolina*, 747 F.3d 15, 24 (1st Cir. 2014) (quoting *Rodríguez–Vives v. P.R. Firefighters Corps of P.R.*, 743 F.3d 278 (1st Cir. 2014)). Instead, taken as a whole, "the allegations of the complaint [must] make the claim . . . at least plausible." *Ocasio–Hernández v. Fortuño–Burset*, 640 F.3d 1, 14-15 (1st Cir. 2011).

Stripped of conclusory legal allegations, the Complaint alleges that:

- The Plaintiff told O'Reilly that she could not work 8 hour shifts because of her children's special needs. Compl. ¶ 23.

- The Plaintiff was "qualified to perform the essential functions of her job . . . with the reasonable accommodations that Defendant had previously approved and implemented." Compl. ¶ 31.

- By "forcing Plaintiff to choose between her job and caring for her disabled children, Plaintiff was constructively discharged and thus subject to adverse employment action." Compl. ¶ 32.

- "Defendant knew at the time of the adverse employment action, that Plaintiff had a relative or associate with a disability." Compl. ¶ 33.

- "Based on her children's needs, Plaintiff requested and was granted a reasonable accommodation, to wit: consistent part-time hours." Compl. ¶ 35.

uncovered in a reasonable investigation" of the Plaintiff's charge. *See Thornton v. United Parcel Serv., Inc.*, 587 F.3d 27, 32 (1st Cir. 2009).

- "As set forth above, Defendant discriminated against Plaintiff based on her association with her disabled children. Among other unlawful acts and omissions, Defendant improperly cut Plaintiff's hours and subsequently imposed unreasonable working terms and conditions that Defendant knew Plaintiff could not meet; terminated without justification Plaintiff's ongoing reasonable accommodations; made false or misleading statements to Plaintiff concerning 'company policy'; and relied without basis or justification on such 'company policy' to constructively discharge Plaintiff and/or compel her resignation." Compl ¶ 36.

The Plaintiff's theory behind Count II is that O'Reilly "us[ed] her children's disabilities as leverage" to force her to resign. *See* Pl.'s Opp'n 5. But because O'Reilly was under no obligation to reasonably accommodate the Plaintiff, its action in changing her hours knowing that she would resign is simply not a violation of the ADA. "The ADA does not require an employer to restructure an employee's work schedule to enable the employee to care for a relative with a disability." *Tyndall v. Nat'l Education Ctrs., Inc. of Cal.*, 31 F.3d 209, 214 (4th Cir. 1994) (addressing associational disability claim). I therefore set aside the allegations pertaining to O'Reilly cutting hours, imposing unreasonable terms and conditions that the Defendant knew the Plaintiff could not meet, and terminating the Plaintiff's "reasonable accommodations."

What is left are the Complaint's allegations that the Defendant made false or misleading statements to the Plaintiff concerning "company policy" and relied without basis or justification on "company policy" to compel her resignation. While these allegations effectively plead that the reasons O'Reilly gave for its decision to compel the Plaintiff's resignation were pretextual, they do nothing to support the

Plaintiff's contention that the real reason for the adverse action was unlawful disability-based animus against the Plaintiff and/or her sons with disabilities.[9]

An associational disability claim must be based on an unfounded stereotype or assumption about the Plaintiff or her children with disabilities. This Complaint does not allege any such unfounded stereotype or assumption or provide any factual support for such a claim. O'Reilly made no "unfair assumption" that Knight would miss work to care for her children. The Plaintiff herself directly informed the Defendant that she could only work a specific schedule. *See Tyndall*, 31 F.3d at 214 (employer did not make an unfounded assumption that plaintiff would have to miss work to care for son where plaintiff stated "that she would in fact have to miss additional work in order to be with her son").

Stripped of its conclusory language and studied in the light of the Plaintiff's concession that the ADA imposes no duty to provide reasonable accommodation to a non-disabled employee based on her association with individuals with disabilities, the Plaintiff has not plausibly pleaded a claim of associational discrimination.[10]

---

[9] The Plaintiff alleges that the Defendant knew about her children early in her employment, *see* CSMF ¶¶ 9, 35, so there is also no temporal connection to suggest unlawful bias. *See Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 511 (3d Cir. 2009) ("[T]he record is devoid of evidence indicating that [the defendant's] decision to fire [the plaintiff] was motivated by [the plaintiff's daughter's] disability. Indeed, [the defendant] was aware of [the plaintiff's daughter's] disability for many years before [the plaintiff] was fired.").

[10] Out of an apparent abundance of caution, the Plaintiff responded to the Defendant's motion for judgment on the pleadings on Count II as both a Rule 12 motion and a Rule 56 motion. To establish that she met her Rule 56 burden of showing a prima facie case of associational disability discrimination, the Plaintiff marshalled the facts demonstrating causation. Specifically, she pointed to record evidence that O'Reilly knew that she was not able to work full-shifts, that O'Reilly told her that eight-hour shifts were "company policy," and that O'Reilly continued to employ delivery specialists to work shifts of less than eight-hours. Pl.'s Opp'n at 9. These facts do not change my analysis. Even if I were to allow the Plaintiff to amend Count II to include these allegations, she would still fail to state a claim of associational discrimination under the ADA.

Accordingly, I conclude that the Defendant is entitled to judgment on the pleadings on Count II.

## III. Retaliation

The Plaintiff alleges that the Defendant unlawfully retaliated against her for engaging in conduct that is protected by the MHRA, Title VII, the ADA, and the MWPA. The Defendant moves for summary judgment on all retaliation claims and presents two arguments. First, the Defendant argues that the Plaintiff cannot establish that she engaged in protected conduct under Title VII and the MHRA by reporting sex discrimination. Second, the Defendant contends that all of the Plaintiff's retaliation claims fail because she cannot establish that any adverse action was motivated by her protected conduct. I address each argument in turn.

### A. Reports of Sex Discrimination as Protected Conduct

The Plaintiff claims that the Defendant retaliated against her for reporting sex discrimination, which is protected conduct under Title VII and the MHRA. Both claims are evaluated under the *McDonnell Douglas* framework. *See Bachelder v. MjjM Enterprises, Inc.*, No. 2:17-CV-00454-JAW, 2019 WL 921443, at *14 (D. Me. Feb. 25, 2019).[11] To establish a prima facie case of retaliation, the Plaintiff must show that " '(1) she engaged in protected conduct under Title VII; (2) she suffered an adverse employment action; and (3) the adverse action was causally connected to the

---

[11]    The Law Court has jettisoned the *McDonnell Douglas* framework for MWPA claims, *see infra*, but has not done so for MHRA claims. *Bachelder v. MjjM Enterprises, Inc.*, No. 2:17-CV-00454-JAW, 2019 WL 921443, at *14 (D. Me. Feb. 25, 2019).

protected activity.' " *Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009) (quoting *Marrero v. Goya of P. R., Inc.*, 304 F.3d 7, 22 (1st Cir. 2002)).

The Defendant argues that the Plaintiff is unable to establish that she engaged in protected conduct. Def.'s Mot. 17-21. In order to establish that she engaged in protected conduct, the Plaintiff need not prove that the conduct she opposed actually violated Title VII, but only that "she had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Fantini,* 557 F.3d at 32 (alteration and quotation marks omitted). The Defendant contends that "[n]o reasonable person in the Plaintiff's position would have believed that she had been a victim of actionable sex discrimination, because no reasonable person would have believed that she suffered an adverse employment action when she was instructed to do her job." Def.'s Mot. 19. The Defendant argues that because stocking shelves was part of the Plaintiff's job, she could not reasonably have believed that she was the victim of a legal wrong. Def.'s Mot. 21.

The Plaintiff describes a work environment where delivery specialists with downtime were told to stock shelves if they were women, but if they were men they were allowed to read newspapers, drink coffee, look at their phones, and chat. I have no difficulty concluding that it is objectively reasonable for an employee in the Plaintiff's shoes to believe that a violation of Title VII occurs when a supervisor regularly requires only women to work while men employed in the same position are allowed to stand idly by. *See Feingold v. New York*, 366 F.3d 138, 152-53 (2d Cir. 2004) (adverse employment action requirement in Title VII disparate treatment

claim established by showing employees of one race were "subjected to an excessive workload," compared to other employees); *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1090 (9th Cir. 2008) (female employee established adverse employment action element by showing that she "was given a disproportionate amount of dangerous and strenuous work" compared to employees who were men); *Whited v. Tennessee*, 781 F. Supp. 2d 621, 627 (M.D. Tenn. 2011) ("heavier workloads that were disproportionate to the workloads" of other employees constituted adverse employment action).

## B.    Motivated by Retaliatory Animus

Finally, I address the Defendant's argument that the Plaintiff has failed to establish that O'Reilly's adverse employment action was motivated by retaliatory animus. In her Complaint, the Plaintiff alleges retaliation for conduct protected by the MHRA, Title VII, ADA, and MWPA.[12] The Plaintiff specifically identifies her protected conduct as: (1) in April and May of 2016, complaints about workplace safety to O'Reilly and OSHA; (2) in May of 2016, complaints pertaining to sex-based disparate treatment in the distribution of work to O'Reilly; (3) in May of 2016, complaints about reducing her hours in response to her complaints about disparate treatment to Liedke; (4) in August of 2016, complaints about O'Reilly's attempts to

---

[12]    The MWPA "prohibits retaliation against an employee who makes a good-faith report of 'a condition or practice that would put at risk the health or safety of any person." *Theriault v. Genesis HealthCare LLC*, 890 F.3d 342, 349 (1st Cir. 2018) (quoting 26 M.R.S. § 833(1)(B)) (alteration and quotation marks omitted). "To prevail on a [MWPA] claim, the plaintiff must demonstrate that '(1) she engaged in activity protected by the [M]WPA; (2) she experienced an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action.' " *Walsh v. Town of Millinocket*, 28 A.3d 610, 616 (Me. 2011). Under the MWPA, unlike the *McDonnell Douglas* framework, "a plaintiff must present evidence of causation up front, not wait for the defendant to introduce evidence of its legitimate reason for terminating her." *Theriault*, 890 F.3d at 350 (citing *Brady v. Cumberland Cty.*, 126 A.3d 1145, 1157 (Me. 2015)).

require her to work full-shifts; and (5) continued complaints up to and including her August 23, 2016, meeting with Hebert. Pl.'s Opp'n 10.[13]

The Defendant mounts two arguments. First, it argues that the people responsible for the Plaintiff's termination, Thomas and Hebert, did not even know that the Plaintiff had made an OSHA complaint and therefore could not retaliate against her because of it. Second, it argues that, even in the light most favorable to the Plaintiff, there is no evidence of retaliatory motive.

Taking the facts in the light most favorable to the Plaintiff, Knight complained of sexual discrimination to the company TIPS line and reiterated those complaints to Hebert around April or May of 2016. She then made complaints to OSHA in the same time frame. Liedke knew of the OSHA complaints and he significantly reduced the Plaintiff's scheduled hours without explanation within just two weeks of her complaints. At this same time, Liedke's demeanor towards the Plaintiff changed, and he became short-tempered with her. During their August 23, 2016, meeting, when Hebert informed the Plaintiff that she either needed to work full-time shifts or be removed from the schedule, he became agitated and stated that "he and Liedke had

_____

[13] The Plaintiff does not identify any specific act in either her Complaint or in her opposition to the Defendant's motion that amounts to protected activity under the ADA. The Plaintiff mistakenly claims that the "Defendant has not challenged the 'ADA retaliation' claim articulated in Count III, so the Plaintiff is not obligated to present evidence of causation or pretext." Pl.'s Opp'n 14 n.4. The Defendant argued that it was "entitled to judgment on *all the Plaintiff's retaliation claims* because the record, construed most favorably to her, will not support an inference that any adverse employment action was motivated, even in part, by her protected conduct." Def.'s Mot. 21 (emphasis added). Because the Plaintiff provides no basis upon which I can to translate her allegations of ADA retaliation into "specific conduct protected by the ADA," *Oliveras–Sifre*, 214 F.3d at 27, and because there is no requirement under the ADA to provide a reasonable accommodation in the associational disability discrimination context, I consider the Plaintiff's ADA retaliation claim abandoned and thus waived.

been trying to get rid of her for months." CSMF ¶ 117. A reasonable jury could understand this statement to mean that Hebert and Liedke had been seeking a cover to terminate the Plaintiff ever since she began to complain. These facts raise an inference that the adverse action taken against her was either motivated by her sex-discrimination complaints, her workplace safety complaints, or both. Because I find that there are trial-worthy issues, the Defendant's motion for summary judgment on Count III is denied.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Defendant's motion for judgment on the Plaintiff's ADA count (Count II) and **DENIES** the remainder of the Defendant's motion.


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 21 day of March, 2019.